UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| JENNIFER CARR,<br>　　Plaintiff,<br><br>v.<br><br>RICHARD MURPHY,<br>RACHEL CAREY-HARPER,<br>ALAN BURT, and<br>HOMELESS NOT HOPELESS, INC.,<br>　　Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) | Docket No. 21-CV-10434 |

## **COMPLAINT AND JURY DEMAND**

### INTRODUCTION

1.　　Plaintiff Jennifer Carr ("Plaintiff" or "Carr") was responsible for overseeing a house and its 7 formerly homeless residents 24 hours per day, 7 days per week, from December 2018 to October 2020. For this important but difficult work, Defendant Homeless Not Hopeless, Inc. ("HnH") paid Carr no wages and no salary. Although HnH did give Carr a single room in the house during her time at HnH, it paid her **zero** cash wages for her work as a house manager. She had to use food stamps to feed herself.

2.　　When Carr learned in October 2020 that this arrangement violated the minimum wage laws, Carr filed a complaint with the Massachusetts Attorney General and other government agencies, and told Defendant Richard Murphy ("Murphy"), the President of HnH, that she had done so. Murphy responded by terminating Carr's employment in an act of blatant retaliation, and later filed in Housing Court to evict Carr from the house even though she had already agreed to leave. Because HnH paid Carr no wages, Carr was not eligible for unemployment benefits after her retaliatory termination.

1

3.  During her employment at HnH, Carr also suffered from sexual harassment and sex discrimination. In 2019, the HnH Chief Operating Officer, Ernie Tocci ("Tocci"), made unwanted sexual advances toward Carr, including sending her text messages that he "love[d]" her, "want[ed]" her, and "really need[ed] a woman." After Tocci was terminated in or about November 2019 for unrelated reasons, Carr sought to be promoted to Chief Operating Officer but a less qualified man was promoted instead. After that man left a few months later, Carr again applied for the promotion but Murphy refused to consider her, giving a pretextual reason. On information and belief, Murphy and HnH failed to promote Carr because she is a woman.

4.  Although HnH is a nonprofit that purports to carry out a charitable mission to educate homeless people and enable them to live independently, in fact it provides little to no education to its residents, and sustains its operations only by taking unlawful advantage of formerly homeless house managers like Carr. HnH justified its failure to pay Carr by asserting that she was a "volunteer," although HnH had agreed to compensate Carr with free rent for her work, and it would have been impossible for her to make a living elsewhere while carrying out all of her responsibilities for HnH. Carr was an employee, and was entitled to all of the legal protections of employment, including but not limited to minimum wage and overtime requirements.

JURISDICTION AND VENUE

5.  This action arises under the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.*; and other relevant state and federal statutes and laws, as hereinafter more fully appears.

6.  This Court has subject-matter jurisdiction over claims arising under federal law pursuant to 28 U.S.C. § 1331, and supplemental jurisdiction over claims under state law pursuant to 28 U.S.C. § 1367.

7.	In addition, this Court has diversity jurisdiction over state law claims pursuant to 28 U.S.C. § 1332(a)(1).

8.	Venue is appropriate pursuant to 28 U.S.C. § 1391 because all Defendants reside in Massachusetts, and a substantial part of the events or omissions giving rise to the claims asserted herein occurred in Barnstable County, Massachusetts.

PARTIES

9.	Plaintiff is a resident and citizen of Florida.

10.	Defendant Murphy is a resident of Hyannis, Massachusetts. Murphy was the Treasurer of HnH for the duration of Carr's employment at HnH. Murphy has also been President of HnH since approximately August 2019, and currently serves as Chief Operating Officer (COO) of HnH.

11.	On information and belief, Defendant Rachel Carey-Harper ("Carey-Harper") is a resident of Dennis, Massachusetts. For at least part of Carr's employment at HnH, Carey-Harper was the President of HnH and/or was responsible for managing HnH and the payment of employees.

12.	On information and belief, Defendant Alan Burt ("Burt") is a resident of Centerville, Massachusetts. Burt has at various times been a member of the Board of Directors of HnH. For at least part of Carr's employment at HnH, Burt had the title and/or role of COO of HnH and was an agent or officer of HnH having management of HnH.

13.	Defendant HnH is a Massachusetts nonprofit corporation with a principal office at 119 Baxter Road, Hyannis, Massachusetts.

STATEMENT OF FACTS

*Carr Came to HnH Because She Needed a Place to Stay*

14. Carr is a 51-year-old woman with a master's degree and a bachelor's degree, both in education. Carr also has completed the coursework for a doctorate in educational leadership, and is now working on her thesis.

15. In late 2018, Carr became homeless after a difficult divorce and a subsequent abusive relationship.

16. In October 2018, after Carr attempted to harm herself using alcohol, Carr entered a rehabilitation program in Falmouth, Massachusetts.

17. In December 2018, Carr had completed the program and she needed to be discharged, but the sober houses that had available beds were not suitable.

18. In or around the week of December 10, 2018, Burt, who co-founded HnH, came to the rehabilitation facility to interview Carr for a temporary housing program called Belonging to Each Other in Falmouth. On information and belief, at that time Burt was the Program Director of Belonging to Each Other.

19. Burt offered Carr a bed at that program, which would have given Carr free housing for the winter or until she could find other housing arrangements. On or about December 14, 2018, Carr called Burt to accept, but Burt informed her that the bed was already taken.

20. However, Burt told Carr that he had a place for her at HnH, and she could have a free bedroom if she became a house manager. Glad to have found a place to live, Carr accepted.

21. On December 19, 2018, Burt picked up Carr and her belongings and brought her to HnH, where she met the then-COO of HnH and the other house managers. Burt had Carr fill out a residency application and had her sign a job description.

*Background on HnH Operations*

22.     HnH's mission is to help get homeless men and women off the street by providing them with a place to live and resources so that they can get jobs and find their own housing independently.

23.     HnH operates four houses in Barnstable, Massachusetts. At each of those houses, between 7 and 14 men or women live in furnished bedrooms, including a house manager who is typically formerly homeless. Some houses also have a live-in assistant house manager.

24.     In order to live at HnH, residents are required to pay a "community fee" of approximately $450-475 per month, and to contribute toward communal meals by providing approximately $100 per month in either food stamp benefits or grocery store gift cards.

25.     Although HnH received zoning exemptions on the basis that it is an educational program, it provides little to no organized education to its residents.

26.     In applying for a building permit in 2012, HnH represented to the Town of Barnstable in a public hearing that its houses were "supervised 24/7." That supervision was and is provided by house managers.

27.     House managers were responsible for ensuring the safety and security of the residents, many of whom had substance abuse and/or mental health challenges. House managers had to live in their houses and were effectively on duty or on call twenty-four hours per day, as crises or issues with or between residents could occur at any hour.

28.     During her employment at HnH, Carr spent nearly all of her time at HnH or on HnH business. She had only a handful of days off (approximately seven in total) in close to two years that she worked there.

29.     As house manager, Carr reported to the President and the COO of HnH. She also attended weekly meetings with either Burt or Carey-Harper (alternating weeks), where they would give the house managers guidance and instructions on how to perform their jobs. At some point these meetings began to be respectively led by Murphy and another HnH board member instead of Burt and Carey-Harper.

30.     According to the job description Carr signed on December 19, 2018, the house manager position included the following duties:

   a.   Hold regular meetings with house residents to address any issues pertinent to all residents;

   b.   Attend a "staff meeting once a week with the President of HnH";

   c.   Meet with each resident individually on a weekly basis;

   d.   Ensure that residents are performing daily household chores as required by their residency agreements;

   e.   Make sure that house laundry is done and that residents are adhering to an acceptable laundry schedule, no more than once per week;

   f.   Administer random drug and alcohol screens to residents;

   g.   Conduct fire drills at least annually; and

   h.   Monitor clients for compliance with their residency agreements, and issue written warnings to residents who broke house rules.

31.     Carr performed these duties, and others, over the course of her time at HnH.

32.     Carr also successfully solicited donations for HnH, including new furniture for her house soon after she joined HnH.

33.     Carr's responsibilities also included interviewing potential new residents.

34. At times, Carr spoke by phone with potential residents from Rhode Island, and spoke by phone to potential donors or others outside Massachusetts as part of her employment with HnH.

35. Carr's job description stated at the beginning of the document, "Residential House Managers (those living on site) will be compensated by not being charged a community fee."

36. Aside from occasional expense reimbursements and holiday gifts of $50 in 2018 and $100 in 2019, Carr received no further compensation for her services.

37. The job description did not describe Carr's hours, and she did not ever enter into any written agreement concerning the hours she should work. She did not agree to work as a volunteer, nor would such an arrangement have been legal under applicable minimum wage laws.

38. HnH keeps no records of house managers' hours. In response to a request for a copy of Carr's time, attendance, and payroll records pursuant to state regulations, Murphy wrote, "Homeless Not Homeless Inc. does/did not have an employee named Jennifer Carr. We did have a volunteer named Jennifer Carr." However, HnH's website identified, and continues to identify, Carr as a House Manager under "Our Team," and not as a volunteer.

*Carr Worked in a Discriminatory Environment in Which Sexual Harassment Was Tolerated*

39. Carr had sole responsibility, without an assistant house manager, for a house of 7 women from her start on December 19, 2018, to her last day as a house manager on October 17, 2020.

40. In addition, for a period of a few months, Carr took responsibility for another house of 11 women because that one had no house manager. Thus, Carr had to go back and forth between two houses in Barnstable and manage 18 residents.

41. Other than Carey-Harper, who had made significant financial donations to HnH, almost

all of the officers of HnH during Carr's employment were men.

42. In or about February 2019, the longtime COO of HnH stepped down due to health reasons, and was replaced by Tocci.

43. Almost immediately, Tocci began making unwanted romantic advances at Carr, who reported to Tocci. Tocci repeatedly invited Carr to date him, which she declined. Over the course of 2019, Tocci sent Carr text messages including some that read, "I still love ya good night"; "I really do want you"; and "I really need a woman." Carr did not reciprocate or encourage these advances.

44. After other house managers reported Tocci's sexual harassment to Carey-Harper, Burt and another co-founder of HnH contacted Carr to discuss the issues, but Carr did not provide them with documentation of Tocci's harassment because she feared retaliation. Carr knew that other residents who had spoken up against HnH practices had been forced to leave, and she was afraid to become homeless again.

45. Tocci and Murphy also made sexually inappropriate comments to female residents, which made both them and Carr uncomfortable and contributed to a hostile environment. Because of other residents' complaints, beginning in or around July 2019, Tocci was not allowed to go to one of the houses for women, and Carr would have to address any issues that came up with the 11 women in that house if the house manager could not handle them.

46. In or about October 2019, another woman complained about Tocci's sexual harassment. Because this was a second complaint, Murphy asked Tocci to go to counseling. On information and belief, Tocci did not participate in counseling and there were no consequences for his failure to do so.

47. On or about November 8, 2019, Tocci was fired for unrelated reasons.

48.     After Tocci was terminated, Carr made known to Murphy and others her interest in becoming COO of HnH. Murphy was aware that Carr had already been performing many of the responsibilities of the COO under Tocci, and even Tocci had previously told Carr that she should be the COO.

49.     On or about November 10, 2019, Murphy announced that the new COO was a man named Adam Burke ("Burke"), who had no relevant experience and whose most recent employment was as a cook. On information and belief, Burke had no fundraising experience and did not have a degree in education or another relevant field.

50.     After approximately one month, Burke abruptly left HnH.

51.     On information and belief, Burt took over as interim COO of HnH starting in mid-December 2019.

52.     In or about January 2020, Murphy took on the role and title of COO as well as President.

53.     On or about February 2, 2020, HnH posted the COO position on Craigslist. Carr provided an application, with paper and electronic copies of her portfolio, directly to Murphy.

54.     About late March or early April 2020, Carr asked Murphy if she could interview with the HnH Board of Directors for the COO position. Murphy refused to interview Carr or allow her to interview with the Board, saying that Carr did not have fundraising experience. In fact, Carr did have some fundraising experience (including successfully soliciting a donation of new furniture from a furniture store, which others had not been able to do in the past), and lack of fundraising experience had not been an impediment to Burke becoming COO a few months earlier.

55.     On or about October 5, 2020, Murphy told a member of HnH leadership that Carr was terrific and did great work, but that he would not hire her as COO.

56.     On information and belief, Murphy and HnH did not hire Carr as COO because she is a

woman.

57. Murphy's inappropriate comments continued throughout Carr's time at HnH. For instance, on or about October 8, 2020, Murphy told one of Carr's residents that the resident "thinks below the waist line." The resident came home upset and very uncomfortable at Murphy's sexually charged comment.

*Carr Engaged in Protected Legal Activity and Suffered Retaliation*

58. After losing hope that she would be hired for the COO position, Carr did some legal research and learned that the way HnH was failing to pay her for her work violated minimum wage and other laws.

59. On or about October 6, 2020, Carr filed a complaint for nonpayment of wages with the Massachusetts Attorney General's Office.

60. In the following days, Carr also filed a complaint of sex discrimination with the Attorney General's Office and contacted the Equal Employment Opportunity Commission to explore filing a discrimination complaint.

61. On or about October 8, 2020, Carr also sent a letter to the Internal Revenue Service reporting that HnH was committing fraud or abusing its tax protections as a nonprofit because it was not actually providing the educational services that were the basis for its charitable status.

62. Soon thereafter, Carr informed Murphy that she had filed these complaints. In particular, on October 11, 2020, Carr sent an email under a pseudonym to Murphy and the HnH board members stating that HnH was not providing services to residents as it had promised, that the HnH board had "approved not to pay full time employees to carry out their mission of the organization," and that "A complaint has been filled with the Atorney General was well as with the IRS." (typographical errors in original) Carr sent a second email from the same email address

a few minutes later, which contained Carr's real name.

63. On or about October 17, 2020, Murphy came to Carr's house, accused Carr of writing the pseudonymous email, and informed her that she was terminated as house manager, with another house manager present as a witness at Carr's request. Carr understood that her termination was because of the complaints she had filed, and Murphy gave no other reason.

64. HnH did not give Carr any written notice or explanation of her termination, although Carr repeatedly requested a letter documenting her termination.

65. On or about October 21, 2020, Carr drove down to Florida with some of her belongings. Murphy and HnH understood that Carr had agreed to leave and was in the process of moving out.

66. When she returned to Massachusetts, Carr needed to take a COVID-19 test and quarantine in order to satisfy state requirements before she could return to HnH. Carr continued to gather her belongings and try to arrange to move to Florida.

67. On or about November 4, 2020, Murphy unnecessarily issued a notice to quit to Carr.

68. On or about November 6, 2020, Murphy filed an eviction action against Carr. This action was unnecessary because Carr was already in the process of moving out.

69. On information and belief, the eviction action was retaliatory and was intended to hinder Carr's ability to secure rental housing in the future, since she now has an eviction on her record.

COUNT ONE
Fair Labor Standards Act – Minimum Wage
29 U.S.C. § 216(b)
(HnH)

70. Plaintiff realleges, reasserts and incorporates by reference the facts and allegations stated in the previous paragraphs.

71. Plaintiff was an employee of HnH.

72. HnH failed to pay Plaintiff the minimum wage required by the Fair Labor Standards Act for the hours she worked.

73. HnH is not entitled to claim credit for the lodging it provided Carr because, among other reasons, it failed to maintain the records required under Section 3(m) of the Fair Labor Standards Act and because it provided the lodging for its own benefit and required Carr to be "on call" virtually all the time.

74. As a result of HnH's unlawful acts and practices, Carr has suffered damages in an amount to be proven at trial.

COUNT TWO
Fair Labor Standards Act – Overtime
29 U.S.C. § 216(b)
(HnH)

75. Plaintiff realleges, reasserts and incorporates by reference the facts and allegations stated in the previous paragraphs.

76. Plaintiff worked in excess of 40 hours per week on numerous occasions during her employment with HnH.

77. No overtime exemption applies to Plaintiff's employment with HnH.

78. HnH failed to pay Plaintiff overtime as required by the Fair Labor Standards Act for the hours she worked.

79. As a result of HnH's unlawful acts and practices, Carr has suffered damages in an amount to be proven at trial.

COUNT THREE
Fair Labor Standards Act – Retaliation[1]
29 U.S.C. § 218c
(HnH)

80. Plaintiff realleges, reasserts and incorporates by reference the facts and allegations stated in the previous paragraphs.

81. Plaintiff engaged in protected activity in order to assert her rights under the wage and hour laws, including but not limited to by filing a complaint with the Massachusetts Attorney General.

82. HnH was aware that Plaintiff engaged in protected activity.

83. Because of Plaintiff's protected activity, HnH discharged and otherwise retaliated and discriminated against Plaintiff, including but not limited to by evicting her from the room she had been occupying as an employee and resident of HnH.

84. As a result of HnH's unlawful acts, Carr has sustained lost wages and other damages to be proven at trial.

COUNT FOUR
Massachusetts Wage Act – Unpaid Wages
Mass. Gen. Laws ch. 149, § 150
(All Defendants)

85. Plaintiff realleges, reasserts and incorporates by reference the facts and allegations stated in the previous paragraphs.

86. The individual defendants are, or were at relevant times, the President and/or Treasurer of HnH, and/or were officers or agents of HnH having management thereof, and are therefore

---

[1] This claim is presented for the convenience of the parties, as administrative remedies have not yet been exhausted.

considered employers under the Massachusetts Wage Act.

87.     Plaintiff filed a nonpayment of wages complaint and received a private right of action letter from the Attorney General's Office on or about December 21, 2020.

88.     Defendants failed to pay Plaintiff the minimum wage required by Massachusetts law for the hours she worked.

89.     Defendants were not entitled to credits for the lodging they provided Carr under the Massachusetts Minimum Fair Wages Act because, among other reasons, they did not give Carr the prior written notice required by 454 C.M.R. 27.05(2). Even if they had followed the proper procedure for deducting from Carr's wages for lodging, 454 C.M.R. 27.05(2) allows no more than $35 per week of an employee's wages to be deducted for lodging.

90.     Defendants otherwise failed to pay Plaintiff the full amount of wages she earned, including but not limited to overtime payments required under the Fair Labor Standards Act.

91.     As a result of Defendants' unlawful actions, Plaintiff suffered damages in an amount to be proven at trial, but in excess of $75,000.

COUNT FIVE
Massachusetts Overtime Law
Mass. Gen. Laws ch. 151, § 1B
(All Defendants)

92.     Plaintiff realleges, reasserts and incorporates by reference the facts and allegations stated in the previous paragraphs.

93.     The individual defendants are, or were at relevant times, the President and/or Treasurer of HnH, and/or were officers or agents of HnH having management thereof, and are therefore considered employers under the Massachusetts Overtime Law.

94. Plaintiff worked in excess of 40 hours per week on numerous occasions during her employment with HnH.

95. No overtime exemption applies to Plaintiff's employment with HnH.

96. HnH failed to pay Plaintiff overtime as required by Massachusetts law for the hours she worked.

97. As a result of HnH's unlawful acts and practices, Carr has suffered damages in an amount to be proven at trial, but in excess of $75,000.

## COUNT SIX
Retaliation - Massachusetts Wage Act
Mass. Gen. Laws ch. 149, §§ 148A, 150
(HnH and Murphy)

98. Plaintiff realleges, reasserts and incorporates by reference the facts and allegations stated in the previous paragraphs.

99. Plaintiff engaged in protected activity in order to assert her rights under the wage and hour laws, including but not limited to by filing a complaint with the Massachusetts Attorney General.

100. Defendants were aware that Plaintiff engaged in protected activity.

101. Because of Plaintiff's protected activity, Defendants discharged and otherwise retaliated and discriminated against Plaintiff, including but not limited to by evicting her from the room she had been occupying as an employee and resident of HnH.

102. As a result of Defendants' unlawful acts, Carr has sustained lost wages and other damages to be proven at trial.

COUNT SEVEN
Sex Discrimination and Sexual Harassment[2]
Mass. Gen. Laws ch. 151B, § 9
(HnH and Murphy)

103. Plaintiff realleges, reasserts and incorporates by reference the facts and allegations stated in the previous paragraphs.

104. HnH discriminated against Carr on the basis of sex, including but not limited to by failing twice to hire or promote her because she is a woman and by maintaining a hostile working environment.

105. Carr was sexually harassed in her employment by her supervisors, for which HnH is strictly liable.

106. As a result of Defendants' actions, Carr has suffered damages in an amount to be proven at trial.

COUNT EIGHT
Massachusetts Equal Rights Act – Sex Discrimination and Sexual Harassment
Mass. Gen. Laws ch. 93, § 102
(HnH and Murphy)

107. Plaintiff realleges, reasserts and incorporates by reference the facts and allegations stated in the previous paragraphs.

108. HnH discriminated against Carr on the basis of sex, including but not limited to by failing twice to hire or promote her because she is a woman and by maintaining a hostile working environment.

109. Carr was sexually harassed in her employment by her supervisors, for which HnH is

---

[2] This claim is presented for the convenience of the parties, as administrative remedies have not yet been exhausted.

strictly liable.

110. As a result of Defendants' actions, Carr has suffered damages in an amount to be proven at trial.

## COUNT NINE
### Sexual Harassment
### Mass. Gen. Laws ch. 214, § 1C
### (HnH)

111. Plaintiff realleges, reasserts and incorporates by reference the facts and allegations stated in the previous paragraphs.

112. Carr was sexually harassed in her employment by her supervisors, for which HnH is strictly liable.

113. As a result of Defendants' actions, Carr has suffered damages in an amount to be proven at trial.

## COUNT TEN
### Taxpayer First Act – Retaliation[3]
### 26 U.S.C. § 7623(d)
### (HnH)

114. Plaintiff realleges, reasserts and incorporates by reference the facts and allegations stated in the previous paragraphs.

115. Plaintiff engaged in protected activity, including but not limited to by submitting a complaint to the Internal Revenue Service concerning what she reasonably believed to be violations of the internal revenue laws.

---

[3] This claim is presented for the convenience of the parties, as administrative remedies have not yet been exhausted.

116.     HnH was aware that Plaintiff engaged in protected activity.

117.     Because of Plaintiff's protected activity, HnH discharged and otherwise retaliated and discriminated against Plaintiff, including but not limited to by evicting her from the room she had been occupying as an employee and resident of HnH.

118.     As a result of HnH's unlawful acts, Carr has sustained lost wages and other damages to be proven at trial.

WHEREFORE PLAINTIFF REQUESTS THAT THE COURT ORDER:

a.     That judgment be entered for her and against Defendants;

b.     That Plaintiff be compensated for any loss of wages and/or benefits, damage to reputation and earning capacity, and other damages incurred as a result of Defendants' unlawful acts;

c.     That Plaintiff be awarded an amount of money that will fairly compensate her for the emotional and physical pain and suffering caused by Defendants' unlawful acts;

d.     That Defendants pay Plaintiff's costs and attorneys' fees resulting from this action;

e.     That Defendants be ordered to pay Plaintiff multiple, liquidated, and/or punitive damages as permitted by applicable law;

f.     That Defendants be enjoined from unlawful discrimination, harassment, and retaliation;

g.     A declaration of the rights of the parties; and

h.     Such relief as may be just and proper and/or that will make Plaintiff whole.

**PLAINTIFF DEMANDS A TRIAL BY JURY ON ALL ISSUES SO TRIABLE**

Respectfully submitted,
JENNIFER CARR,
By Her Attorney,


_/s/David A. Russcol_____
David A. Russcol (BBO #670768)
Zalkind Duncan & Bernstein LLP
65a Atlantic Avenue
Boston, MA 02110
(617) 742-6020
drusscol@zalkindlaw.com

Dated:  March 12, 2021